Good morning. May it please the Court and Council, Deputy Attorney General Elaine Meckenstock for Defendant Appellant. I'd like to reserve four minutes for rebuttal if I may. At both steps of the two-step inquiry applicable to challenges under the Privileges and Immunities Clause, the District Court here applied legal rules that conflict irreconcilably with binding precedent of the Supreme Court and this Court. Defendant Appellant respectfully requests that this Court reverse those errors and grant him summary judgment. At the first step of the inquiry, the District Court erroneously found it sufficient for plaintiffs to point to the bare existence of differential fees for residents and non-residents that affect the activity of commercial fishing. This analysis conflicts with the Supreme Court's decision in McBurney and with this Court's decision in Andrews. Let's assume that we don't agree with you at step one, just for the sake of this question. It is, after all, a commercial activity and the fee structure is facially differential or discriminatory. My issue with your part of the case is how close does the fit have to be between the State's interest and the amount charged? In other words, you've presented evidence that the State spends many millions of dollars on the commercial fishery, but there doesn't seem to be evidence, unless I've missed it, that demonstrates how much a typical commercial fisherman pays in State taxes that an out-of-State fisher does not, or some other way to determine how much of the burden would be appropriately allocated to them. So does there have to be some evidence along those lines? I don't think so, Your Honor, because under the Supreme Court's rule in Toomer, as it was applied in Mulaney, and also the Supreme Court's decision in Camden, what the primary focus of the analysis is on the State's expenditures of its own funds. So let's say there was a shortfall of a million dollars between what in-State people pay and what the State actually expends, and one commercial fisher from somewhere else wanted to come in. Could you charge them the full million dollars to make up the deficit? No. Although we don't have complete clarity from the Supreme Court on what they mean by mere compensation under the Toomer rule, I wouldn't think that one commercial fisherman, non-resident commercial fisherman, would be expected to fill the entire gap. But then how do we draw a line? Is it just completely arbitrary to say, well, it seems okay, it doesn't seem too big, or there's some ratio, the way we are punitive damages, to figure out what is the ratio? I mean, what do we do? Well, I think here you can look to the percentage of participation of non-residents in the fishery. So the non-residents represent about 11% of the overall commercial fishing licensees and permit holders in California, and the $400,000 that California collects in the non-resident differentials is only about 3% of the gap between revenues collected and expenditures made. And again, that's only accounting for expenditures from the Department of Fish and Wildlife and not from other state agencies. So when you're comparing 3% of the gap with an 11% participation rate, we believe that if that isn't mere compensation, as the court intended under Toomer, then we're not sure quite what would be. Well, I thought that actually the analysis needed to be a little bit more granular than that, and that what you needed to show was that basically at the individual fisherman level, what the out-of-state folks were paying is roughly comparable to what the in-state folks are paying, taking into account, obviously, the fact that in-state folks are paying additional taxes, I guess, and maybe income taxes that out-of-state folks aren't. And if you don't have evidence to show that the burdens are roughly comparable, then you lose. So why is that wrong? Well, so that's the analysis that has been applied in the taxation cases, such as in lending and travelers and some of the other tax cases. That's not the analysis that the court considered or discussed in the Toomer case or when the court applied the Toomer rule in Mullaney. But doesn't your entire argument then depend on our accepting your notion that there's a different analysis for tax cases and for common calling cases? Well, I certainly think that that's true, Your Honor, that there is a different analysis. But regardless of whether one wants to look to the taxation rules, I think we have to look at the fact that the Toomer case and the Mullaney case both involved commercial fishing fees, differential commercial fishing fees, such as we have here. And those other cases, lending and travelers and Austin, did not. And the court has never mixed the two cases. It didn't rely on Toomer for its analysis in the taxation cases or vice versa. But isn't it just fortuitous that Toomer and Mullaney both involved common calling and other cases didn't, or both involved fishing rights and others didn't? What is there to suggest that the Supreme Court has really applied? I mean, they talk about common calling and common calling cases, and they talk about tax and tax cases, and they talk about apples and apples cases and oranges and oranges cases, but they apply the same analysis. Well, I'm not sure that that's true, Your Honor, because the Toomer rule and the way that was applied in Mullaney didn't get down to the granular level of looking at the individual taxpayer or the individual fisherman. They looked to the state's total expenditures on enforcement and compared that to the total amount that they collected, the state collected from nonresidents. And we believe that that's the proper analysis in a common calling case like this one. If we were to disagree with you on that, would the right result be to reverse and remand for a trial? I mean, this came up on cross motions for summary judgment, and there are facts out there in the world that could match the approximate burden that in-state fishers carry in terms of state and local taxes and so forth that out-of-state don't. So one could figure it out. So if, and I know you don't concede this point, but if we were to disagree with you, wouldn't that be the right outcome? Certainly, Your Honor's could remand to the district court for additional factual development under a clarified legal analysis. As you say, we don't in any way concede that that is the proper test. We believe that the proper test is demonstrated in the Mullaney case and that the New Jersey Supreme Court applied a version of it in the Solario case as well, and that the proper analysis here is to look to how much the state is expending. In other words, what the state can be compensated for under the court's articulation of the rule in TUMOR and not to the taxation cases in which the court is looking to equalize the burdens. And to some extent, this turns on differential interests involved in state taxation versus access to pursuing employment opportunities. So the court has... Can I stop you because I guess I'm just having a hard time even understanding your argument that TUMOR somehow falls into a different category from, I guess, what you're calling the taxation cases. I just don't read the cases that way, but I'm thinking maybe I'm missing something. In TUMOR, I thought the key thing was that the fee for the out-of-state folks was, what was it, a hundred times larger. Why would there have been any need to even make an observation about the differential if that wasn't the key focus? Well, I think that actually makes my point, Your Honor, in that the differential was so high as to be virtually exclusionary, and yet the court did not stop its analysis at that point. It went on to say that states are authorized to charge non-resident differentials to compensate themselves for two categories of expenses, higher enforcement costs that are imposed by non-residents and states' investment in conservation expenditures. Well, but no, I mean, let me just read the relevant language because I think you kind of tried to truncate it in your brief. It says... What page are you on? This is page 399 of TUMOR. In charge, non-residents a differential, which would, as you just said, merely compensate the state for any added enforcement burden they may impose, or for any conservation expenditures from taxes which only residents pay. And it seemed to me that's why you needed to show here, okay, well, what is the amount in taxes that only residents are paying? And if you can calculate that at the individual fisherman level, then you can stick that to the non-resident folks, but you never showed that. Well, so two things, Your Honor. One is this doesn't say anything about calculating the individual fisherman's contribution to the fishery. It talks about state expenditures from state funds, and it does reference taxes which only residents pay. But on that point, I would refer you to further up in the paragraph where the court says, it talks about that the appellee's brief might be construed to mean that the state's conservation program for shrimp requires expenditures of funds beyond those collected in license fees, funds to which residents and not non-residents contribute. Now, it's, so I think what the court is saying and what the Mulaney application of this rule demonstrates is what is relevant here is how much the state is spending. Now, it's true that in 1948, when TUMOR was written, the court referred to taxes as taxes that only residents pay. That may be because the ability to tax non-residents was fairly new, and state revenues have, or revenue, the nature of state revenues has expanded dramatically since then. But I don't think that the, sorry, I don't think that the district court's approach or the approach that you're suggesting, Your Honor, can be reconciled with the Camden case either, in that in that case the court focused on state funds that the state controlled or administered and said that that was a crucial factor in the analysis. But I guess what seems wrong about your whole approach to this is that you're ignoring the underlying purpose of the Privileges and Immunities Clause. It's precisely to protect at an individual level the right of someone who doesn't live in the state to, at least in the common calling context, to engage in an occupation on the same, roughly the same terms as in-state residents. Well, so that It's not an analysis in gross. It's at an individual level. That is true at the first step level. That is what the clause is looking at, a substantial equality of the ability to compete for employment opportunities. But the fact that the state can then justify, I mean, the fact that the Supreme Court would have allowed South Carolina, had it had sufficient evidence, to justify a differential that was a hundred times higher indicates that the Privileges and Immunities Clause, at least in the common calling context or specifically in commercial fishing fee context, doesn't require substantial equality at the second step. Otherwise, the case would have been over by the facial distinction between the two types of fishermen. You're not now making a distinction between fishing cases and all other cases, are you? No. What I'm saying, if you don't accept the distinction between fishing, between common calling cases and taxation cases, which I think is clear from the case law, that there — that the rule in TUMOR still applies, because that was a commercial fishing fee case as this is. So regardless of whether you think it's a different rule, the TUMOR rule is still applicable, and it allows for inequality at the second step to be justified. Why would there be a different rule in the two sets of cases? Well, I think that's an excellent question that the Court hasn't really explained, but the Court has also not explained that in the Dormant Commerce Clause context, which is also concerned about economic protectionism. I'm asking you, give us the reason why we would enshrine that into law. Certainly. I can't think of any good reason for it. Well, I think the interests are very different on both the state side and the nonresident side in the two cases. So the Court has referred to TUMOR as the leading case on the state's ability to bias employment opportunities. So what is really at issue in the common calling context is the ability to pursue your common calling. In the income tax and property tax cases, it's once you've exercised that right, you shouldn't have to pay more than a ratable share of the general costs of the general services that everyone in the country benefits from. And you see these principles in the Dormant Commerce Clause context as well, where there is a hard distinction between taxation cases and other cases involving pursuit of professions. You're down to about two-and-a-half minutes, if you want to save that for your role. Good morning, Your Honors. Stuart Gross on behalf of plaintiffs, a class of men and women who reside outside of California and seek to earn a living in the state as commercial fishermen. This case, as I think the panel's questions indicate, is not complicated. There's facial discrimination here, making it So that's not the end of it, because the State is entitled to have differential fees if they can be justified. And at least in my mind, the issue is what specifically must be shown to justify the fee, differential. And what sort of evidence, in your opinion, would suffice to justify a differential fee? Thank you, Your Honor. Two types of evidence potentially could show it. One would be that the nonresident fishermen, they presented a peculiar management or enforcement burden, let's say hypothetically. And the evidence was absolutely to the contrary of this. Hypothetically, nonresidents, because of the size of their boats, it costs the State more to license them. That's not a justification that's offered in this case. Absolutely. It's more along the lines of we spend a lot of money, a lot more than we collect from the resident commercial fishers. And so we also can collect from the nonresidents more. So in that realm, what can they show? Right. The proper way to show it, and the standard's clear, is you do an individual basis analysis. You look at and you take the amounts that they claim the State spends on commercial fishing, and you examine to what extent is that paid for out of general funds. And then you take the population of California or the taxpayers, and you look at it and you say, okay, well, a taxpayer, a resident fisherman, he's contributing this amount of money. And we can then charge that additional amount of money to this fisherman. Can I just stop you right there? Yes. How exactly would you figure that out at the individual fisherman level? We did it. So we actually submitted this evidence. So this evidence was submitted, and using their figures, the amount that a resident fisherman contributes in general taxation is about $2. So the difference... How do you... How did we do it? Yeah, how did you come up with that? This is how we did it. So we actually, so we took their, they posited that certain expenses in one program, that that was all commercial fishing and one third of enforcement. We took that amount. We then looked at their documents and we found the amount of general funds that were spent on those services. It's actually very small. The Department of Fish and Wildlife gets almost all of their funding from fees and penalties. So actually that $20 million figure is a point of clarification. Most of it actually comes from other resource users. We then took the population, we actually took the number of taxpayers. Well, why is that to your client's benefit? They're not other commercial fishers. Well, and I think the point, though, is this, is if the state wants to, it wants to say we're not going to have other resource users subsidize commercial fishermen. It has to do it in a way which is substantially equal to non-resident and resident fishermen who are seeking to earn a common calling. The state could decide that commercial fishermen need to bear the entire burden of their programs that they benefit from. The state could actually decide that it's going to make a profit from all of them. What the state can't do and what it did here is say we've got a shortfall and we're going to make up some of that shortfall on the backs of non-residents and we're not going to ask the same of residents. Can I just make up a hypothetical set of facts and just tell me if I'm either wrong on the law or if it's just different from our case here? Let's say that the state showed that it spent $20 million out of general taxation revenues that obviously only in-state residents are paying into to support some kind of a resource like this fishery. Why couldn't it say, geez, we're spending $20 million. You guys, the out-of-state fishermen, capture roughly 10% of the benefits of that expenditure. We're going to stick $2 million of that cost to you guys and we'll sort of figure out, I don't know, there are 100 of you and we'll just pro rata distribute it across that. Could the state do that? No. And the reason the state cannot do that is because the rights protected on their privileges and immunities are the rights of individuals to pursue their common calling on terms of substantial equality. Now, for example, in the situation we have here, we actually have some non-resident fishermen who are paying $4,000 extra in differential fees. Other non-residents are paying about $250 in differential fees. The other component of justifying the rule or justifying any discrimination is a close relationship, a narrow tailoring between the discrimination and the we've got a certain amount of funds that we need to make up. And we're simply going to go out and charge some non-residents a huge amount and others not so much. In my example, though, why wouldn't you say that all the state's doing is having the out-of-state folks pay their fair share of the cost of maintaining this resource? Because of the comparison between the similarly situated non-resident fishermen and the resident fishermen. Because each, if you take your example, and I think what we have is we've got the numbers we're looking at are about, I think that they had about 700 non-resident fishermen is what they said. So you would have 700 non-resident fishermen, each one of them bearing that burden of whatever, $2 million you said, right? Then you would have their resident fishermen, the 6,000 resident fishermen, all they would be paying in this circumstance. We assume it's general fund and we assume the argument is, well, it's being paid out of the general fund. Because of the size of California, each one of those non-resident fishermen would be chipping in $5, $10, $15. So here's my question. The state says 11% of the commercial fishing is done by out-of-state residents who pay only 3% of the fish and wildlife amount. The other 89% are in-state residents. What percentage of the fish and wildlife expenditures does that 89% residents pay? Do they pay the remainder? Do they pay 10%? Do they pay 1%? What's the relationship? It's tiny. We actually, one of the analyses we did was we took the... Is there evidence in the record? There is. And you don't remember the number? Yeah, well, if we did the entire budget of Department of Fish and Wildlife... Well, let's use the same thing that they're using. Okay. It's $2. No, I don't want dollars. I'm asking about percentages. 11% out-of-state commercial fishers pay 3% of the fish and wildlife expenditures. Let's take that as a given for now. I'm trying to understand, of the 89% remaining, that's the resident fishers, what percentage of the fish and wildlife expenditures do they pay in fees, as distinct from their income taxes and so forth? Oh, in fees. Okay, in fees. So we're not doing income taxes. Got it. In fees, they are, of their $20 million figure, if I'm correct, I think that what they said was there was approximately $6 million, and that $6 million was divided by all fishermen, and they posited about 7,000 fishermen. 700 of those were non-residents. It's a small percentage. I can't do the math on the fly. I think one of the... And I apologize for that, Your Honor. It just seems like there are a lot of different ways to analyze it, any of which could be legitimate. For example, you could take the resident fishers from a particular year and figure out what they individually paid in state income taxes, which the non-residents didn't pay. And that could be the number, or some percentage of that could be the number. So there are a lot of different ways, and I guess I'll ask you the same question. If the district court was wrong to say this was appropriate for summary judgment, why shouldn't there be some factual development to determine what is a relationship that is reasonable? And there must be many, many different ways that experts could come in and discuss how you would determine what a reasonably equivalent burden might be, if that's the test. I understand, Your Honor. To our minds, the standard here was clear, and the defendants had three, four years to come forward with that evidence. They did not. And we came forward with the evidence that foreclosed the ability to do it. So when you look at... Well, both of you think you deserve summary judgment. That happens a lot, and sometimes we say neither one of you deserves summary judgment. So... The question is whether or not, if we agreed with you on the law, which is what the district court agreed with you on the law, are there any disputed material facts that are disputed? Or are you saying that you put in all your evidence about how much more in dollars and in percentages than the in-state fishermen pay, and it wasn't disputed? That's right. There are no disputed material issues of fact. If it was remanded to the district court, we would reinitiate our summary judgment motion immediately. There... If we agreed with you, which is to say agreed with the district court's analysis, you're saying there are no disputed questions of fact. I think that Judge Graber asked Ms. Magenstock the same question, and she seemed to feel that there were going to be disputed issues of fact, even if we agreed with you on the law. Well, I'll put it this way. If the standard applied here... If you agree with me on the law that the standard to be applied here is one of substantial equality on an individual basis, and that in making that calculation, you have to take into account what each resident contributes through resident-only taxation, and compare that with what non-residents are paying in differentials, if that's the standard, that standard cannot be met by the state. They cannot meet that standard. Well, it strikes me that there are other expenditures that the state makes that are not specific to fishing that out-of-state residents take advantage of, too, when they come to do something commercial within the state. Roads and bridges and everything else that a state deals with. So the state had the opportunity to bring forward that evidence. We actually demanded it many, many times that they bring forward that evidence, and they said, eventually, we are not seeking to prove that. We will not prove that. So hypothetically, maybe the state could have chosen to do that when they were in district court and had the opportunity to meet their burden. They made the choice not to do that. So at this point, we could remand it back, but that would mean we would go back and litigate again four years what we litigated in the state, did not ever bring forward. Well, in order for us to approve of a summary judgment one way or another, we would have to conclude de novo that one of you is entitled to judgment as a matter of law on the existing record, and if we don't agree with you 100 percent and we don't agree with the other side 100 percent, that would appear to be our only option. And, Your Honor, the proof that we put forward and the proof that they put forward, there is no opportunity for them to be able to meet the burden to show that it's closely related to achievement of a substantial state interest that is based on a standard of substantial equality on an individual basis. Can't do it. So your point really is that if we agree with you in the district court on how limited Step 1 is, then we get to Step 2, the burdens on them. Right. And they didn't meet it. It's that simple. They did not meet their burden. It's the same as a summary judgment in a plaintiff's case. A plaintiff is not allowed on a summary judgment to come in and say, well, can I get another bite at the apple, because maybe I could find some different evidence. They had the opportunity to put their evidence in when they had the burden and they didn't meet it. And to remand now just gives them a second bite at the apple, which they're not entitled to. But before you sit down, can you just say something about the tumor rule? Now, you say the substantial equality rule applies across the board no matter what kind of case. She's got tumor. Tumor is this case. Right. And tumor states explicitly and defined the standard of substantial equality. So the idea that tumor in dicta, and it is dicta where they talk about this compensation, that they actually were establishing a different standard that ignored the heart of the standard of substantial equality. That doesn't make sense. The other problem with their argument is essentially what are you saying is dictum? Yeah. The court says that the State can charge nonresidents a differential which would merely compensate the State for any added enforcement burden, which isn't the case here, or for any conservation expenditures from taxes which only residents pay. And you think that's dictum? Right. Because what they were actually looking at at that point was the justification put before them by the State was simply it was about enforcement burden for shrimping. And what they said was, no, you have not met your burden to show that nonresidents were. Not entirely correct. My recollection of the case is that the part of the State's justification was that there was a need to protect the, to conserve the resource as well, which is not really the same as enforcement. It's conservation. Right. So that was part of the case. It was part of the case, but what they argued, what the State argued and the Supreme Court said they did not meet their burden on was showing that the nonresidents were a peculiar source of that burden, of that conservation burden. So what they were talking about here is they said, and if you look at the ‑‑ I believe ‑‑ But they do say they can compensate the State for conservation expenditures from taxes which only residents pay. Yes, Your Honor. So how do you get from there to the dollar amount that you want us to say is correct? How I get there from the dollar amount that I want you to say is correct is the fundamental standard outlined in Toomer is that citizens of State A can go into State B and earn a living on terms of substantial equality with citizens of that State. That standard is what has been used over and over to strike down laws that discriminate when there is no substantial basis to do so. Now, if you want to, if you ‑‑ and I think that's, you know, they argue there's a difference between tax cases and in other cases. No. What there is is in these assessment cases is you just have different options to justify. Since it's a specific assessment for a specific activity, the State has an additional ability to justify by saying in engaging in this activity, nonresidents present a unique burden. Other than that, then, they have to show that at the end of the day, when people come into the State, when they travel from other places to earn a living, they're not already starting with the hand tied behind their back, because they're chipping in $4,000 to the services they're enjoying, and their resident competitor is pitching in $2. Counsel, you've exceeded your time, and I think we understand your position. Thank you, Your Honor. Thank you. Ms. Meckenstock, you have some rebuttal time remaining. Thank you, Your Honor. I just want to start with one quick clarifying point that the information Plaintiff's Counsel was referring to in terms of the analysis they did is from their expert report that was not admitted into evidence. We described that at footnote 13 on page 26 of our reply brief. We objected to it as improperly offered rebuttal, and the district court did not admit it. She didn't resolve our motion either. We do think that I also want to clarify that most of the funds that we are talking about in terms of State investment do come from residents. So whether they come from the State's general funds, as Mr. Warrington's declaration demonstrates a sizable amount does, or whether they come from the Fish and Game Preservation Fund, which are fees that are paid by resource users, most of those folks are, in fact, residents. Also, the case below was mostly a fight about the legal standard, and we did ask for bifurcation to resolve that before we prepared all of our evidence. So we certainly, if this court agrees that the district court was generally correct, we would not object to a remand for offering more evidence consistent with whatever formula this court offers. Do you have an answer to my question about the percentage relationship? You said in your main argument that 11 percent of the commercial fishing is done by out-of-state residents who pay only 3 percent of the Fish and Wildlife Department's expenditures. I think that's what I wrote down. So the remaining 89 percent are residents. What percent of the expenditures of the Fish and Wildlife Department do they pay? By way of fees. Yeah. So as I think we've kind of established, there are multiple ways of breaking this down. So what I was saying was the gap between what Fish and Wildlife collects in commercial fishing revenues. So that encompasses all the fees that are paid by non-residents and residents as well, most of them paid by residents. Three percent is encompassing both residents and non-residents? No. Three percent is the amount of non-resident differentials that are collected, which is about $400,000 a year, just in the differentials for non-residents alone, compared to the gap between the revenues and expenditures. So that's what the money that comes from state funds, that California decides in its sovereign nature that it's going to spend about $14 million of state funds over and above what it collects from all of the fishermen on its commercial fishing program. And that's what makes this case different from Toomer and from Mulaney. And I do want to call this Court's attention to the fact that the analysis as done in Mulaney looked at the total amount payable by non-resident fishermen and found that that was in excess of the program costs. So that's the analysis that we put forward to the Court below, was to look at the total amount collected in differentials from the non-residents compared to the relevant state expenditures, which we concluded would be the gap, the amount that the state is choosing in its sovereign capacity to invest. So I'm having trouble kind of putting my brain around all the numbers. You're saying there's $14 million of general funds, which are taxes, right? State funds. State funds. Which are a mixture of taxes, user fees. Okay. So $14 million of state funds, in your view, is spent on the fishery. Yes. Over and above revenues collected from commercial fishing. So that is the amount that presumably California residents donate through their taxes. Well, it's the amount under Camden that the state chooses to spend resources it controls, money the state could be spending on something else that would benefit its residents. And having chosen to make that investment of its own state funds, it's simply asking non-residents to kick in $400,000 toward that $14 million. So you would compare the totals, then, as being reasonable. So that makes me very uncomfortable for the reason that I said earlier. You have $14 million. Suppose you wanted to collect it all. Could you have thousands upon thousands of dollars of? No. There are two limits on it. It has to be mere compensation. So it can't exceed the amount, sort of the non-resident share. $14 million is a lot. Right. But we're talking about $400,000 here. We are. But we're also talking about the theory of how we figure out what's okay. Absolutely. And so that's why I brought in the 3% compared to the 11% figure. So if, for example, California were collecting $7 million of that $14 million from non-residents, then I would say we'd have a different case and we would probably have a problem because you'd have non-residents representing 11% of the fishing population, but you'd have them paying 50% of that state investment. That would be overcompensation, I think, under Mulaney. But we don't have that situation here. The facts here are extremely different from the facts in both Toomer and Mulaney, whereas here we have evidence of actual expenditures by the state, which the state did not provide in Toomer, and we don't have overcompensation the way that we had in Mulaney. And I don't see how 3% compared to 11% can be anything other than mere compensation. I don't see how, if this isn't the kind of mere compensation that the Toomer rule allows, what a state could ever do to have differential fees. And Toomer says, and Mulaney say, we can. And Camden says that these investments, the choice of the sovereign state to spend its state funds for this program that then non-residents benefit from, is a crucial factor in the second-step analysis. And if it's okay for the city of Camden, or even potentially okay for the city of Camden, to reserve 40% of public construction jobs for residents, then I don't see how these differential fees, which appear to have no effect on non-resident participation, and ask the non-residents to pay only 3% of the state's investment, could be problematic. Thank you, counsel. The case just argued is submitted. Thank you, Your Honor. And I very much appreciate the excellent arguments from both counsel. It was very helpful to us.
judges: Friedman, Graber, Watford